1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11   SUE MARCELLA HAMBY,

12          Petitioner,                    No. CIV S-97-0164 LKK CHS P

13          vs.

14   TINA FARMON,

15          Respondent.           <u>FINDINGS AND RECOMMENDATIONS</u>

16   _____/

17   I.    <u>INTRODUCTION</u>

18          Petitioner Sue Hamby is a state prisoner proceeding with counsel on a

19   second amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

20   Hamby attacks her March 16, 1994 conviction in the Solano County Superior Court,

21   case number C35712, for conspiracy to commit first degree murder.

22   II.   <u>ISSUES</u>

23          Petitioner's May 20, 2009, second amended petition raises three issues as

24   follow, verbatim:

25          A.    Petitioner was denied her rights to Due Process and to jury trial by
                  the court's failure to instruct the jury on conspiracy to commit a
26                lesser offense;

                                            1

B.   Petitioner was deprived of rights guaranteed by the Sixth and Fourteenth Amendments by the court's refusal to instruct on accessory after the fact, which decision was made after argument was completed; and

C.   The accumulation of error rendered her conviction fundamentally unfair and a violation of her rights to Due Process under the Fifth and Fourteenth Amendments to the U.S. Constitution.

Upon careful consideration of the record and the applicable law, the undersigned will recommend that this petition for habeas corpus relief be denied.

III.   FACTUAL AND PROCEDURAL HISTORY

A.   Facts[1]

The events occurred in Hawkins Bar, a small hamlet located on Highway 299 in Trinity County.  Hawkins Bar consists of a general store, a set of BP gasoline pumps adjoining the store, and a bar (Simon Legree's) located across the highway from the store.  Next to the store was a trailer park.  It was here that Barbara Adcock lived with Bernard "Bird" MacCarlie and her three children from a prior marriage.

Below the highway, along the river, was a United States Forest Service campground accessible by a service road.  In September and October 1991 a group of people were camped in the campground.  They were described by local residents as drunk and violent, especially wild and out of control.  Some of the campers had been there several weeks; some were drifters.  One couple had come to get

_____

[1] This statement of facts is taken from the July 1, 1996 opinion by the California Court of Appeal for the First Appellate District (hereinafter Opinion), lodged with respondent's answer as Exhibit L, Part 1.  The murder of Hop Summar resulted in the prosecution of multiple defendants, in separate trials, some of which involved multiple juries.  Hamby was tried along with Cherri Frazier and Robert Fenenbock in front of a single jury.  This statement of facts from the California Court of Appeal is drawn from only the facts presented at Hamby's trial and presented to the jury that determined Hamby's guilt, unlike the statement of facts from the California Court of Appeal opinion concerning Bond and MacCarlie, where that court consolidated the appeals of Bond, MacCarlie, Adcock and Lockley, resulting in a single statement of facts that not only referenced the testimony heard by the Bond jury and the MacCarlie/Dodds jury, but also the testimony heard by the Adcock/Lockley jury.  That is why the California Court of Appeal statement of facts may be relied upon here, but not in the Bond (99-cv-2150) and MacCarlie (00-cv-1830) Findings and Recommendations.  These facts have not been rebutted with clear and convincing evidence and therefore are presumed correct.  28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

married at the Harvest Moon Festival on October 5. Defendant Cherri Frazier was there to attend the wedding. Some of the local residents-including Adcock, MacCarlie and defendants Fenenbock and Hamby-spent time at the campground.

*The Prosecution's Case*

It was the prosecution's theory that Hop Summar was killed by a mob from Hawkins Bar seeking to avenge an alleged act of child molestation upon Barbara Adcock's daughter.

*The Victim*

Hop Summar was a pathetic figure.  Crippled from numerous childhood orthopedic surgeries, he walked with a limp (hence the nickname, "Hop").  Though he was in his 30's, he was physically frail, wore a colostomy bag, and had a rather meek disposition.  He lived on SSI (Supplemental Security Income) and drank to excess nearly every day.  He seldom bathed and was distinctive for his offensive body odor.

Hop had known Bird MacCarlie for several years, and he often lived with Bird in the trailer Bird shared with Barbara Adcock and her children.  Sometimes Hop looked after Adcock's children while Adcock was partying at the campground.

*The Molestation Accusations*

On September 30, 1991, Barbara Adcock reported to the Trinity County Sheriff's Department that Hop Summar had molested her five-year-old daughter Rachelle H.  (Ultimately neither the sheriff nor the county's Child Protective Services found any evidence that Rachelle had been molested.) Adcock and Bird MacCarlie then proceeded to spread the accusations among the denizens of Hawkins Bar.

*Solicitation of Mike Sutton*

Defendant Cherri Frazier arrived at the Hawkins Bar campground on September 30.  She was there to attend the wedding of Leafe and Michelle Dodds.  Frazier had camped at Hawkins Bar earlier that summer.

Almost immediately upon her arrival, Frazier encountered Barbara Adcock, who told her of the molestation of Rachelle. That same day, or the following day, Frazier gave a ride to Mike Sutton, a drifter also camping at Hawkins Bar.  During the ride Sutton noticed a blue-handled knife on the dashboard.  Frazier said, "I'm going to go and cut off Hop's balls."  Frazier asked Sutton to come with her, but he

refused.  She then told him to "stay out of it."

In that same ride, Frazier told Bert Jones (another transient camped at Hawkins Bar) that she needed to do something about Hop's molestation of Barbara Adcock's daughter; that she would drag Hop into the woods herself and kill him if she had to.

On the evening of October l, Mike Sutton was in the campground and heard Bird MacCarlie, Barbara Adcock and "Redbeard" Bob Bond discussing how to kill Hop.  Barbara Adcock was sitting at a picnic table with defendants Cherri Frazier and Sue Hamby.  Barbara and Cherri asked Sutton if he wanted to be in on it, as they weren't getting any help from the others.  He declined.  As he walked away from the group of women, Sutton heard the women discussing that defendant Sue Hamby was to keep Hop at her house so that Barbara Adcock could find him once she rounded up help to hurt him.  Later that night, Sue Hamby apologized to Mike Sutton for being so forward in the conversation.

*The Assaults Upon Hop*

On October 1, Hop went into Arcata and withdrew $600 in cash from his bank account.  About 5:30 in the evening, he returned to Hawkins Bar, having hitched a ride.  The driver dropped him at the BP pumps.  As Hop tried to enter the trailer where he resided with MacCarlie and Adcock, a group approached him and began to call him a rapist and a child molester.  Included in the group were MacCarlie, Adcock, defendant Fenenbock, defendant Frazier and others.  As the crowd egged her on, a woman named April May Gault chased Hop, caught up with him when he stumbled, and beat him.

The attendant at the BP pumps did not see the beating, but he saw Hop just afterward.  His face was cut and bleeding.  Hop told him April May had hit him with a beer can.

Sometime later, Hop was assaulted again.  About 6:00 he went into Simon Legree's, the town bar.  The bartender and patrons observed that Hop's face was cut and bleeding.  Hop told the bartender that Harry Darr had struck him in the face with a pistol because he had refused to get into Darr's truck.

Indeed, just beforehand, Harry Darr had come into Maeolla Berry's trailer in the trailer park.  When he left, he jumped into his truck and rode across the highway.  Maeolla Berry could see a gun in the truck.  Hop Summar was standing across the street.  Maeolla Berry did not see Darr get out of

his truck, but she heard Hop yelling for help, and she saw Darr drive off as patrons of the bar came out to help.

*Defendant Hamby's Role*

Defendant Sue Hamby lived in a trailer east of Hawkins Bar. Her friend, Michael "Scarecrow" Roanhouse, lived in a second trailer on Hamby's property.  She gave him food in exchange for repairwork on the property.  Hamby was engaged to marry Tex Lockley.

On the morning of October 1, Barbara Adcock and her children appeared at Hamby's trailer.  Adcock told Hamby her accusations against Hop Summar.  After Adcock left, Hamby told Scarecrow Roanhouse, but Scarecrow said he didn't believe Adcock's story.

That afternoon, Hamby went to Maeolla Berry's trailer and asked for her advice. Hamby told Maeolla Berry that she was supposed to keep Hop in her trailer and let Barbara Adcock know so that Adcock could call the police.  Berry advised Hamby to call the police herself.

After their conversation, Berry drove Hamby to the campground so Hamby could retrieve her truck.  On the way Hamby telephoned Hop to tell him to stay where he was, at Simon Legree's, and she would pick him up.  Later that evening, Hamby and Scarecrow Roanhouse came into Simon Legree's.  Hop was dozing on his bar stool, with his purple backpack at his side.  When he awoke, Hamby got him into her truck and drove him to her trailer.  He slept on her couch.  The next morning, Hamby left her trailer and went to the campground.  According to her testimony, Hamby told Scarecrow to keep an eye on Hop in case the police arrived.

*The Confrontation with Hop*

Hop did not stay in Hamby's trailer.  About 6:15 or 6:30 p.m. Tex Lockley and Scarecrow Roanhouse were driving in Lockley's red flatbed truck from the general store down to the campground when they saw Hop on the access road. They stopped and gave him a ride in the back.  Hop was carrying his purple backpack.[FN]

> FN. Tex Lockley's truckbed was bloodied from the carcass of a wounded pit bull dog.

As the truck approached the campground, however, a group angrily came toward the truck, shouting, "Get him out of here."  Barbara Adcock shook a baseball bat, yelling, "Get

the fuck on out of here." Tex Lockley shifted quickly into reverse and backed the truck up the hill to the highway.

Scarecrow Roanhouse testified that as the truck reached the top of the hill and the passengers got out, defendant Fenenbock and Redbeard Bob Bond walked toward the truck. The two men walked up to Hop and struck him in the face. Redbeard Bob hit him in the mouth; defendant Fenenbock hit Hop in the eye. They accused Hop of being a child molester, and Hop replied, "Not guilty. Not guilty."

At this point Steven Thayer was walking up the access road and passed the red truck. As he did so, he saw Bird MacCarlie and Leafe Dodds drive up in Barbara Adcock's white Ranchero.[FN2] They, too, talked to Hop, and Hop replied that he hadn't done anything. Hop asked, "What are you going to do? Kill me here? Throw me in the bushes or something?" Bird MacCarlie replied, "Yeah, something like that." Steven Thayer testified that when last he saw Hop, Hop was seated inside the Ranchero between Redbeard Bob Bond and Bird MacCarlie. The Ranchero pulled out onto the highway and headed east. The red truck followed.

> FN. Meanwhile, Mike Sutton was in the campground and saw Bird MacCarlie leave in the white Ranchero with Randy H. part way under some blankets in the back. Defendant Fenenbock was not in the campground. He showed up later that evening, along with Bird MacCarlie, Redbeard Bob Bond, and Tex Lockley.

*The Murder*

Barbara Adcock's son, Randy H., Jr., then age 9, was sleeping on a mattress in the back of the white Ranchero. He testified that after stopping at the top of the hill the Ranchero drove to a place where the men started stabbing Hop. The men included Bird MacCarlie, defendant Fenenbock, Redbeard Bob Bond and Leafe Dodds. Afterwards the men dragged Hop to another spot.

Four days later, on October 6, Hop Summar's body was discovered at a logging site. The body was covered with branches and dirt. A piece of rope was found nearby and there were ligature marks on Hop's arms, suggesting he had been tied and dragged. Two logs found nearby were bloodied with Hop's blood. A bloody knife was found 50 to 75 feet away. The blood was Hop Summar's. The knife was the same one used by Bird MacCarlie earlier on     October 2 to stab Bert Jones. Faint tire marks consistent with Tex

Lockley's red truck (but not the Ranchero) were found in the roadway at the end of the drag marks.

Hop Summar died of multiple stab wounds and bludgeoning. His genitals showed signs of severe trauma from a blunt instrument. Numerous bones in his face were fractured. His left ear had been cut off while he was still alive. He had been stabbed 18 times in the skull, 13 times in the chest. His left eye had been cut out. His arm and leg had been stabbed, bringing the total stab wounds to over 70.

*The Stabbing of Bert Jones*

Earlier on the day of the murder, on October 2, Bert Jones, a drifter staying in the campground, got into an altercation with Michelle Dodds. Defendant Cherri Frazier intervened by pushing Jones and demanding that he leave. Barbara Adcock came at Jones with a baseball bat. Jones retreated to his camp about a quarter of a mile from the main campground to pack up and leave.

That evening, Bird MacCarlie and Tattoo Ernie Knapp having heard about Jones's run-in with Michelle Dodds, drove in the Ranchero to Jones's campsite. Bird MacCarlie jumped out of the car and immediately began stabbing Jones. Bird MacCarlie forced Jones and his camp-mate, Steven Thayer, into the Ranchero, and they drove back to the main campground. When Jones got out of the car, Bird MacCarlie put a knife to his ear and threatened to cut it off. Harry Darr eventually intervened and told Jones to leave. Throughout the assault upon Jones, Barbara Adcock castigated Jones for defending Hop.[FN]

> FN. A couple of days earlier, when accusations were circulating about Hop's molestation, Bert Jones had expressed his view to the group at the campground that he didn't believe Hop was guilty. After that, Bert Jones felt unwelcome at the campground, shunned by the others.

Bert Jones and Steven Thayer separately walked up the access road to Hawkins Bar. (It was on this walk that Thayer observed the confrontation between the men in the white Ranchero and Hop Summar.) At the general store Jones showed his stab wound to some people, and one man drove them to the nearest hospital in Willow Creek. There Jones called 911.

Jones told the responding sheriff's deputy that a man named "Hopalong" was going to be killed or injured. As a result of Jones's report, sheriff's deputies descended upon the

campground to investigate.  They did not find Hop's body.  (It was not discovered until October 6, by a local resident searching for wood.) But they did uncover some incriminating pieces of evidence.

*The Investigation*

When various officers (from Humboldt and Trinity County Sheriff's Departments, the California Highway Patrol, the Department of Forestry) arrived in Hawkins Bar, the white Ranchero was parked at the top of the access road with Bird MacCarlie in the front seat.

Sergeant Kartchner, the investigating officer, first checked several places he thought he might find Hop-Sue Hamby's trailer, Bird MacCarlie's trailer, and adjoining trailers.  In the trailer occupied by Ron Ammon and Ila Olson he found Redbeard Bob Bond and defendant Fenenbock, both drunk and disheveled.  Neither had seen Hop, they said.

Sergeant Kartchner headed for the campground.  On the way, he passed the white Ranchero with Bird MacCarlie at the wheel.  Sergeant Kartchner stopped to talk to MacCarlie, and within a few minutes Randy H. popped up from beneath some blankets in the back of the truck; he then sank back down again.

A trail of blood drops led from underneath the Ranchero to a larger area of blood near some beads and scalp hair.  The officers asked MacCarlie to move the Ranchero so they could get a better look, but MacCarlie told them the truck was inoperable.  The officers pushed the vehicle forward.

Bird MacCarlie had a fresh cut on his index finger.  He wore a knife sheath, but the sheath was empty.  He was barefoot and wearing a clean Hard Rock Cafe T-shirt. MacCarlie was eventually placed under arrest that night.

Down in the campground, Sergeant Kartchner interviewed several people.  Tex Lockley had a bloody knife and was arrested.  Deputy Rist was assigned to stand by defendant Sue Hamby while she was waiting to be questioned.  The deputy observed and seized a large buck knife in her back pocket.  Human blood was later detected on the knife.

Mike Sutton told Sergeant Kartchner that night that he knew nothing.  Later, however, he provided much of the incriminating evidence against defendants.

*The Aftermath*

Mike Sutton testified that on the night of October 2, Tex Lockley returned to the campsite and said to Barbara Adcock, "It's done." Defendant Cherri Frazier replied, "Good." Barbara Adcock told them both to "shut up."

Defendant Fenenbock lived in a trailer on the property of Sid Smith. Redbeard Bob Bond and defendant Fenenbock were dropped off at the Smith residence about 8 p.m. that night by Bird MacCarlie driving the white Ranchero.[FN] Fenenbock told Patsy Brown, Sid Smith's wife, "You don't have to worry about that child molester anymore. We took care of him." Patsy Brown later told Sergeant Kartchner that two women were in the back seat of the Ranchero, and she heard Cherri Frazier's voice.

> FN. This evidence-from Patsy Brown and from a neighbor of Sid Smith's-corroborates the testimony of Randy H., who said that after the killing Bird drove to Sid Smith's and dropped off Redbeard Bob and defendant Fenenbock.

The next day, October 3, defendant Fenenbock, Redbeard Bob Bond, and Barbara Adcock arrived at the home of Sue Mendes in Willow Creek. Fenenbock gloated that the "cops didn't even check [his] hands for blood." When Sue Mendes commented that she hoped Hop's body was not in locations where she hunted for mushrooms with her children, both Fenenbock and Redbeard Bob told her not to worry about it.

*The Back Pack*

On the morning of October 3, Mike Sutton saw defendant Sue Hamby rummaging through the back of Tex Lockley's red truck. She pulled out a backpack, which she said was Hop's.

Scarecrow Roanhouse also saw Hamby with the backpack. He saw her open it, search through it, then wipe the outside with a wet cloth. She asked Scarecrow to burn it, but he refused. According to Scarecrow, Mike Sutton suggested cutting it into pieces.

That afternoon, Hamby approached Deputy Litts in the campground and told him she wanted to turn over Hop's backpack. He picked it up from her house that evening. Hamby told him Hop had given it to her the day before. The backpack was stained with Hop's blood.

9

*The Physical Evidence*

Although the white Ranchero was observed near a pool of blood on the night of October 2, Sergeant Kartchner did not notice anything of evidentiary value, and the car was not seized until late October. By then there were no traces of blood.

Tex Lockley's red truck, however, was seized after a sheriff's deputy noticed blood on it. Blood splatters were found inside the truck, as if numerous blows had been struck there. And blood stains were found several places on the exterior of the truck. There was also blood on the driver's seat, smeared as if someone sat in it. And there were blood stains on the seat of Tex Lockley's pants. Rope was also found in the back of the truck.

A shovel found in the red truck had a mixture of blood matching Hop's blood and Bird MacCarlie's blood. Bird MacCarlie had a fresh cut on his finger when he was arrested on October 2. The prosecutor theorized that Bird cut himself burying Hop.

Defendant Fenenbock was arrested the following day, on October 3, on an outstanding warrant. He had a bloody knife which was seized by police. The blood could not be proven to be human.

A $20 bill and a $100 bill in the police inventory were found to be stained with Hop's blood. Bird MacCarlie had $525.59 when he was arrested. Defendant Fenenbock had $32.96. (The booking procedures used by the Trinity County Sheriff's Department do not isolate particular bills taken from prisoners.)

*Fenenbock's Defense*

Defendant Fenenbock testified that he first heard of the molestation allegations on the morning of October 2. He heard Barbara Adcock tell the group about the molestation, and when someone asked, "What are you going to do about Hop?" Barbara Adcock said the police were looking for him and if anything happened to him, she and Bird would be the first ones the police would come to.

Fenenbock admitted confronting Hop that afternoon with Redbeard Bob Bond at the top of the access road. He claimed that he tried to calm Redbeard Bob down and restrained him from hitting Hop. Fenenbock admitted punching Hop once, but only after Hop swung his backpack at him.

Fenenbock saw the white Ranchero drive up with Bird MacCarlie driving and Leafe Dodds and Harry Darr in the back seat.  There was also a yellow Toyota truck with someone in the driver's seat.[FN] Fenenbock, however, left the scene and went back down to the campground. Redbeard Bob Bond and Harry Darr came with him. Later, Bird MacCarlie returned to the campground and gave defendant Fenenbock and Redbeard Bob Bond a ride back to Fenenbock's trailer on Sid Smith's property.

> FN. Tattoo Ernie Knapp had a yellow pickup truck.

Trena Knapp, wife of Tattoo Ernie Knapp, testified that after the confrontation with Bert Jones she saw Bird MacCarlie drive the white Ranchero out of the campground with Redbeard Bob Bond and Leafe Dodds, but it returned five minutes later.  After dinner, about 8:30, Bird MacCarlie, Redbeard Bob Bond, and defendant Fenenbock left in the Ranchero with Randy H. asleep in the back.

*Frazier's Defense*

Defendant Frazier testified that she gave a ride to Mike Sutton on September 30, but she did not discuss the molestation accusations with Sutton or threaten Hop.  In fact, she did not know about the molestation at that time.  She gave Mike Sutton and Bert Jones a ride again on October 1, but there was no conversation about Hop.

Frazier was at the picnic table when Barbara Adcock complained that the authorities weren't going to do anything. But Frazier denied discussing how to kill Hop or asking Mike Sutton or Bert Jones if they wanted to be involved.

When Hop came into the campground in Tex Lockley's truck, Frazier took Rachelle H. and the two boys into the bathroom at Barbara Adcock's request.  She heard Redbeard Bob Bond yell that Hop was at the top of the hill.  And she saw Bird MacCarlie, Redbeard Bob Bond, Leafe Dodds and Randy H. leave the campground in the Ranchero.

Frazier and Michelle Dodds then drove into Willow Creek to buy some tequila.  They passed Bert Jones and Steven Thayer hitchhiking on the highway.  Frazier testified that she drank too much tequila and passed out for about three hours.  When she awoke, she saw Bird MacCarlie, Redbeard Bob Bond, defendant Fenenbock and others in the campground.  Bird MacCarlie was wearing no shirt and his hair was wet.  He said he had stabbed Hop.

11

The next day Frazier asked Barbara Adcock what happened to Hop, and Barbara Adcock traced her finger across her throat. Frazier also heard Barbara Adcock and Sue Hamby discussing where the body was located, whether the police would ever find the body.

A few days later, Frazier was riding in the Ranchero with Barbara Adcock when Adcock asked Frazier to look around and see if there was any blood on the door or dashboard. Frazier didn't see any.

*Hamby's Defense*

Defendant Sue Hamby testified that she and Hop were friends.  He showed up at her house on September 29 and joined her and Scarecrow Roanhouse for a barbecue.  Hop spent the night on her couch.  The next day she dropped him off near the trailer park.

On October l, Barbara Adcock arrived at Hamby's trailer and told Hamby that Hop had molested Rachelle.  Barbara Adcock said she had told the police Hop was staying at Hamby's house and the police were on their way.  Hamby replied that Adcock was misinformed; that she (Hamby) did not know where Hop was. Adcock asked Hamby not to tell Hop that the police were coming for him.

That night Hamby went into Simon Legree's bar to use the phone. Hop was there, passed out at the bar.  Hop's face had been beaten. Hop told Hamby he had been called a rapist, and he asked Hamby if he could stay at her house for the night.  Hop got into the back of her truck, and she drove him to her house.  He slept on her couch. When Hamby left the next morning, Hop was still asleep on her couch. She never saw him again.

Hamby went to the campground to see why Hop had been beaten. When she got there, Barbara Adcock complained that the police weren't going to do anything about the molestation of her daughter.

Hamby disputed the testimony of Mike Sutton.  Hamby denied asking Barbara Adcock or others whether she should keep Hop at her place.  When Barbara Adcock asked Hamby where Hop was, Hamby lied and said she did not know.  Later, Michelle Dodds asked Hamby if she was going to keep Hop at her place until Hop could be dealt with. Hamby replied that she was not keeping Hop at her house; that she did not know where Hop was.  Hamby denied apologizing to Mike Sutton for soliciting his help.

12

Hamby left the campground, and when she returned the confrontation with Bert Jones had just concluded.  Barbara Adcock was yelling and screaming, and she yelled at Hamby that she was "going to kick [her] ass."  Hamby did not see Hop come down into the campground.  She was in the bathroom, but she heard Barbara Adcock shout "Get him out of here."  When Hamby emerged from the bathroom, Cherri Frazier was entering with the [] children.

Hamby heard but did not see the Ranchero leave the campground. Hamby herself left the campground with Scarecrow and Trena Knapp to get a grill for the barbecue.

On October 3, the day after Hop disappeared, Hamby was in the campground talking with Barbara Adcock, and Hamby told Adcock, "They are not going to find anybody ... with a helicopter." What she meant was that a helicopter would be useless for finding Hop in the forest.

Hamby denied taking Hop's backpack from Tex Lockley's truck. She denied wiping blood or fingerprints off Hop's backpack.  What Scarecrow Roanhouse saw her cleaning was dirt (Scarecrow's footprints) from her own purse. Hamby did turn in Hop's backpack to Deputy Litts-the backpack Hop had left in her trailer.

Opinion at 2-14.

B.    State Court Proceedings

Nine persons, Robert Bond, Bernard MacCarlie, Leafe Dodds, Robert Fenenbock, Ernest Knapp, Anthony Lockley, Barbara Adcock, Cherri Frazier, and Sue Hamby were charged in December of 1991 and October of 1992 with various crimes relating primarily to the death of Gary Hop Summar.  There were extensive and voluminous pretrial proceedings.  Ultimately all charges as to Ernest Knapp were dismissed.  The remaining eight persons were tried in three separate cases in two different counties.  With the exception of Dodds, all were convicted of various offenses, and the post-trial proceedings were eventually concluded.

C.    Federal Court Proceedings

Hamby's federal habeas corpus proceeding has been pending for a decade, consumed by the vast state record, the five related federal cases pending in

13

this Court, and overwhelming procedural issues.  On September 9, 2005, Magistrate

Judge Dale A. Drozd held a hearing, resulting in a lengthy report and recommendation

resolving complex procedural matters, particularly the respondent's motion to dismiss,

involving circuitous issues concerning the timeliness of multiple claims.  Judge Drozd's

comprehensive report of September 11, 2006, was adopted by Senior United States

District Judge Lawrence K. Karlton on July 6, 2007.

On March 16, 2009, the Court having resolved the labyrinthine procedural

questions, Hamby was given time to file a second amended petition raising the three

claims remaining in the case.  Respondent's answer was filed on July 13, 2009.  Hamby

has not filed a traverse and this matter is now ready for resolution.

/////

IV.    APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

An application for a writ of habeas corpus by a person in custody under a

judgment of a state court can be granted only for violations of the Constitution or laws of

the United States.  28 U.S.C. § 2254(a).

Federal habeas corpus relief is not available for any claim decided on the

merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established federal law,
as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Although "AEDPA does not require a federal habeas court to adopt any

one methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain

principles which guide its application.

/////

14

First, the "contrary to" and "unreasonable application" clauses are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law.  Woodford v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).  It is appropriate to look to lower court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000).

Second, the court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). So long as the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief.  Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232 F.3d 1031, 1035 (9th Cir. 2000).

Third, in determining whether a state court decision is entitled to deference, it is not necessary for the state court to cite or even be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer,  537  U.S. 3, 8 (2003). Moreover, a state court opinion need not contain "a formulary statement" of federal law, so long as the fair import of its conclusion is consonant with federal law.  Id.

15

V.    DISCUSSION OF PETITIONER'S CLAIMS

    A.    Lesser Offense Jury Instruction

        1)    Description of Claim

Hamby argues that the trial court refused her request to instruct the jury on the elements of a lesser degree of homicide than premeditated first degree murder, which was the alleged target of the conspiracy.  Second Amended Petition at 12. Hamby argues that an instruction other than first degree murder was supported by substantial evidence presented during the trial and that the failure to instruct prevented the jury from determining her level of culpability.  Id. at 13.

While Hamby argues that her counsel requested this instruction, respondent argues that no defendant requested instructions on lesser included target offenses.  Review of the record appears to support respondent's argument.  Reporter's Transcripts ("RT") at 2731, 4508-10, 4683, 4686, 4714.

        2)    State Court Opinion

The California Court of Appeal rejected this claim, stating:

> We agree with the Attorney General that the record does not indicate that instructions on lesser target offenses were requested below.  However, the Attorney General acknowledges that the trial court has a sua sponte obligation to instruct on lesser included target offenses if there is evidence from which the jury could find a conspiracy to commit a lesser offense.  Under Penal Code section 182, the jury must determine which felony the defendants conspired to commit.  The jury cannot perform that task unless it is instructed on the elements of the offense the defendants are charged with conspiring to commit and any lesser offenses which the jury could reasonably find to be the true objects of the conspiracy.  (People v. Alexander (1983) 140 Cal.App.3d 647, 664-665, disapproved on another point in People v. Swain (1996) 12 Cal.4th 593; see People v. Horn (1974) 12 Cal.3d 290, 297, and fn. 4.)
>
> Defendant Hamby argues in her brief that instructions should have been given on conspiracy to commit second degree murder.  She reasons as follows: The jury could have found that the conspiracy into which she entered was a conspiracy

16

to hurt Hop Summar-to punish him, yes, but not to kill him. Because coconspirators are liable for the reasonably foreseeable consequences of the planned offense and because death was a reasonably foreseeable consequence of the plan to inflict physical harm, the jury could have found a conspiracy to commit second degree murder.

Hamby's reasoning is faulty.  The principle that conspirators are liable for the reasonably foreseeable consequences of the planned offense would render Hamby liable for the *substantive* offense of second degree murder, not for conspiracy to commit second degree murder.  (E.g., People v. Superior Court (Quinteros) (1993) 13 Cal.App.4th 12, 21; People v. Luparello (1986) 187 Cal.App.3d 410, 435-445.) The offense of conspiracy requires not only the intent to conspire, but also the specific intent to commit the planned offense.  (People v. Horn, supra, 12 Cal.3d at p. 296.) Under Hamby's theory, the conspirators had no specific intent to kill; thus, they could not be convicted of conspiracy to murder.  (People v. Swain, supra, 12 Cal.4th 593.)

The more logical argument underlying Hamby's theory is that the jury should have been instructed on conspiracy to commit offenses other than murder, e.g., assault, battery, or mayhem.  We requested supplemental briefing on whether assault, battery, and mayhem qualify as offenses necessarily included within the charged target offense of murder.  We conclude they do not.[FN]

> FN.  Because no instructions were requested, we do not decide here whether the offenses of assault, battery, or mayhem would qualify as lesser *related* target offenses to justify instructions upon request.  (People v. Geiger (1984) 35 Cal.3d 510.)

An offense is necessarily included in the charged offense if (1) under the statutory definition of the charged offense the charged offense cannot be committed without committing the lesser offense, or (2) the charging allegations of the accusatory pleading include language describing the offense in such a way that if the charged offense was committed as specified, the lesser offense was necessarily committed. (People v. Clark (1990) 50 Cal.3d 583, 636; People v. Geiger, supra, 35 Cal.3d 510, 517, fn. 4.)

Here, the parties concede that neither assault, nor battery, nor mayhem qualify as offenses included within the statutory definition of murder.  (See People v. Toro (1989) 47 Cal.3d 966, 972 [battery is not within the statutory definition of attempted murder].) However, defendants Hamby and

Frazier argue in their supplemental briefs that the offenses qualify as lesser included target offenses by virtue of language in the information describing the overt acts.[FN]  We are not persuaded.

> FN. Specifically, the third amended information charged that defendants "did conspire together to murder Gary L. 'Hop' Summar and thereafter in furtherance of said conspiracy ... did commit the following overt acts: ... [¶] [A] number of conspirators talked in the Hawkins Bar Campground of what was to be done to suspected child molester Gary L. 'Hop' Summar.... [¶] [Bird] MacCarlie went around to different individuals asking if they were 'in on it or not.' ... [¶] [Redbeard Bob] Bond called Gary L. 'Hop' Summar a child molester and hit him.... [¶] [Defendant] Fenenbock called Gary L. 'Hop' Summar a child molester and hit him.... [¶] [A] conspirator bound Gary L. 'Hop' Summar's arms.... [¶] [A] conspirator cut off one of Gary L. 'Hop' Summar's ears.... [¶] [A] conspirator gouged out one of Gary L. 'Hop' Summar's eyes.... [¶] [A] conspirator broke bones in Gary L. 'Hop' Summar's face.... [¶] [A] conspirator broke one of Gary L. 'Hop' Summar's ribs.... [¶] [A] conspirator hit Gary L. 'Hop' Summar in the testicles.... [¶] [C]onspirators repeatedly stabbed Gary L. 'Hop' Summar with knives."

In People v. Marshall (1957) 48 Cal.2d 394, 405, the Supreme Court first authorized using the language of the accusatory pleading as a yardstick for measuring what offenses qualify as "necessarily included" offenses for purposes of deciding whether the defendant could properly be convicted of a lesser offense.  The Supreme Court reasoned that when the charging allegations reveal all the elements of a lesser offense, the defendant is fairly put on notice that he should be prepared to defend against a showing that he committed the lesser offense.  (Id. at pp. 399, 405 [defendant charged with robbery of an automobile could be convicted of lesser offense of auto theft].)

Here, in the context of deciding whether the trial court was obligated to instruct sua sponte on lesser included offenses, we conclude that allegations of overt acts committed in furtherance of the alleged conspiracy do not provide notice of lesser included target offenses.

For the crime of conspiracy, the criminal act is the

agreement.  The agreement is not punishable unless some overt act was committed in furtherance of the conspiracy. (Pen.Code, §§ 182, subd. (b), 184.) [FN]  But the overt act itself need not be committed by the defendant, and it need not be a criminal offense.  (People v. Robinson (1954) 43 Cal.2d 132, 139-140.)  "To render him guilty it is not necessary that a conspirator perform some act which is in itself unlawful in carrying out the criminal conspiracy.  If there is a conspiracy to commit murder by means of poison sent through the mail, a conspirator may not escape responsibility because he only agreed to and did purchase the postage stamps with which the poison is sent to the victim, an act entirely lawful in itself, but punishable if done under an agreement among the conspirators and in carrying out the unlawful purpose of the conspiracy." (People v. Corica (1942) 55 Cal.App.2d 130, 134.)  It is the agreement, not the overt act in furtherance of the agreement, which constitutes the offense.

> FN. The prosecution must plead and prove, in addition to a criminal agreement, an overt act (Pen.Code, §§ l 82, subd. (b), 184), and due process principles require that overt acts be pleaded with particularity to give the defendant notice of the prosecution's theory.  (Feagles v. Superior Court (l970) 11 Cal.App.3d 735, 739-740.)  We need not reach the question whether the overt act is an actual element of the conspiracy.  The Attorney General relies upon cases holding that the jury need not unanimously agree upon the same overt acts. (E.g., People v. Von Villas (1992) 11 Cal.App.4th 175, 234-235; People v. Jones (1986) 180 Cal.App.3d 509, 516-517.)  Yet, the case law is in conflict on this point.  Other cases have held that the overt act is an element of the crime of conspiracy and jury unanimity is required.  (See generally, 1 Witkin & Epstein, op. cit., supra, § 178, pp. 198-199.)

Because overt acts need not be criminal offenses or even acts committed by the defendant, the description of the overt acts in the accusatory pleading does not provide notice of lesser offenses necessarily committed by the defendant.[FN]  Moreover, inasmuch as overt acts may be lawful acts, the overt acts do not necessarily reveal the criminal objective of the conspiracy.  For example, in the hypothetical posed by the Corica court, an alleged overt act of purchasing postage stamps provides no notice of even the charged target offense of murder, much less of a necessarily included target offense.[FN]

19

FN. Indeed, in the present case some of the alleged overt acts were allegedly committed by Bird McCarlie or persons other than defendants Hamby or Frazier, and some acts were themselves lawful, e.g., talking about what was to be done with Hop, calling Hop a child molester.

FN. We reject the Attorney General's argument that allegations of overt acts are analogous to enhancement allegations, which the Supreme Court has held are not part of the accusatory pleading for the purpose of defining lesser included offenses. (People v. Wolcott (1983) 34 Cal.3d 92, 100-101 [assault with deadly weapon held not a lesser included offense under a charge of robbery with enhancement for use of a firearm].)  In Wolcott, the Supreme Court reasoned that (1) because an enhancement allegation becomes relevant only if the defendant is convicted of the substantive crime, a defendant may not be adequately notified, to satisfy principles of due process, that he must controvert the enhancement allegation to protect against a conviction for a lesser offense; and (2) because the jury determines the truth of an enhancement allegation only after it determines guilt on the charged or a lesser offense, this procedure would become muddled if evidence of the enhancement must be considered in determining guilt of a lesser offense.  Neither of these considerations applies to overt acts of a conspiracy.

In our view, it is the description of the agreement within the accusatory pleading, not the description of the overt acts, which must be examined to determine whether a lesser offense was necessarily the target of the conspiracy.  Here, the information alleged only that defendants conspired to murder Hop Summar. There is nothing in this terse description of the agreement to indicate an agreement with a lesser objective.  We therefore we (sic) hold that the trial court was not required to instruct the jury sua sponte on conspiracy to commit assault, battery, or mayhem as lesser offenses included within the charged offense of conspiracy to commit murder.[FN]

FN. The argument of Hamby and Frazier that the agreement was not, as alleged, to murder, but merely to assault, batter, or maim, is in

essence an argument that there was more than one conspiracy: a conspiracy to assault, batter, or maim (of which Hamby and Frazier were a part) and a separate conspiracy to murder (of which Fenenbock and the other killers were a part).  (See, e.g., People v. Skelton (1980) 109 Cal.App.3d 691, 717-719.) However plausible this argument might have been at trial, it was not made.  No instructions were requested, and the trial court had no sua sponte duty to instruct upon this theory.

Opinion at 19-23.

3)   Applicable Law And Discussion

"Normally jury instructions in State trials are matters of State law."

Hallowell v. Keve, 555 F.2d 103, 106 (3rd Cir. 1977) (citation omitted); see also Williams

v. Calderon, 52 F.3d 1465, 1480-81 (9th Cir. 1995), cert. denied, 516 U.S. 1124 (1996).

An instructional error "does not alone raise a ground cognizable in a federal habeas

proceeding." Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988) (citation omitted);

see also Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th Cir. 1986) (claims that merely

challenge correctness of jury instructions under state law cannot reasonably be

construed to allege a deprivation of federal rights) (citation omitted).  A claim that a state

court violated a federal habeas petitioner's due process rights by omitting a jury

instruction requires a showing that the error so infected the entire trial that the resulting

conviction violated due process.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977);

Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005); see also Estelle, 502 U.S. at

72 (discussing due process standard).  In cases in which a petitioner alleges that the

failure to give an instruction violated due process, her burden is "especially heavy,"

because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a

misstatement of the law."  Henderson, 431 U.S. at 155.  Here, Hamby fails to meet this

heavy burden.

/////

21

First, there is no clearly established federal law that requires a state trial court to give a lesser included offense instruction as would entitle Hamby to relief.  See 28 U.S.C. § 2254(d) (1); Beck v. Alabama, 447 U.S. 625, 638 & n. 7 (1980) (holding that failure to instruct on lesser included offense in a *capital* case is constitutional error if there was evidence to support the instruction but expressly reserving "whether the Due Process Clause would require the giving of such instructions in a non-capital case"); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (in non-capital case, failure of state court to instruct on lesser included offense does not alone present a federal constitutional question cognizable in a federal habeas corpus proceeding), cert. denied, 534 U.S. 839; Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (failure of state trial court to instruct on lesser included offenses in non-capital case does not present federal constitutional question), cert. denied, 541 U.S. 950 (2004).  Accordingly, to the extent Hamby's argument is solely predicated upon the trial court's failure to give a lesser included offense instruction, this claim is not cognizable on federal habeas review and should be denied on that basis.

Second, although "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the [foregoing] general rule," Solis, 219 F.3d at 929, Hamby's was not such a case.  See Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (state court's jury instructions violate due process if they deny the criminal defendant "a meaningful opportunity to present a complete defense"), cert. denied by, Ayers v. Clark, 549 U.S. 1027 (2006) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)).

Hamby argues that "the prosecution noted that there might be evidence supporting a different lesser offense as the object of the conspiracy," that evidence showed Hamby "may have been involved . . . in a plan to hold Hop at her house until the police could arrest him," that there "was evidence introduced to show some kind of

1 connection between petitioner and the others charged with conspiracy," that "the

2 evidence raised a factual question" about intent and that the "prosecution's own case"

3 described overt acts such as assault, battery and mayhem.  Second Amended Petition at

4 13.

5       What Hamby does not argue is that it was her theory of the case that she

6 was guilty of a lesser included target offense.  As the trial judge expressly stated:

7         [I]t doesn't seem that under any theory that's been put
        forward by either the prosecution or defense that there is any

8         possibility of any lesser homicide.

9 RT at 4508.  It does not appear that Hamby challenged the trial judge's conclusion.

10 Here, Hamby does not argue that a lesser included offense was her theory of the case

11 but merely that there was evidence to support such an instruction.  The trial court's ruling

12 therefore did not impact Hamby's right to adequate jury instructions on her theory of the

13 case.

14       Finally, Hamby has not made any showing as to how the alleged failure to

15 instruct had a substantial and injurious effect on the jury's verdict, other than the

16 assertion that it prohibited the jury from determining "her level of culpability."  Second

17 Amended Petition at 13-14.  It seems apparent from the verdict that the jury did

18 determine Hamby's level of culpability, finding her guilty of conspiring to commit first

19 degree murder but not guilty of committing the actual murder.  Hamby has not shown

20 how the trial court's decision effected that verdict. Therefore, even assuming that Hamby

21 had established that the trial court constitutionally erred in failing to give the lesser

22 included offense instruction, and she did not, any such error was harmless.  See Brecht,

23 507 U.S. at 637-38; see also Clark, 450 F.3d at 905 (habeas petitioner must show that

24 the alleged instructional error had substantial and injurious effect or influence in

25 determining jury's verdict).

26 /////

The state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established constitutional law and Hamby is not entitled to relief on this claim.

B.      Accessory After The Fact Jury Instruction

1)      Description of Claim

Hamby argues that after the trial court initially agreed to instruct the jury on accessory after the fact as an alternative to conspiracy, and after closing arguments had been delivered, the trial court decided not to issue the instruction.  Second Amended Petition at 14.  Hamby argues that as a result she was not given an opportunity to argue her case with full knowledge of the instructions that were going to be given thereby impairing her defense.  Id. at 14-15.

2)      State Court Opinion

The California Court of Appeal rejected this claim stating:

> In People v. Geiger, *supra*, the Supreme Court held that in appropriate circumstances a requested instruction on a lesser related offense should be given.  The court identified three prerequisites to such an instruction: (1) there must exist some basis other than an inexplainable rejection of prosecution evidence, on which the jury could find the offense to be less than that charged; (2) the offense must be one closely related to that charged and shown by the evidence; and (3) the theory of the defense must be consistent with a conviction for the related offense.
>
> * * * * *
>
> With respect to defendant Hamby, the Attorney General concedes that there is evidence to support a conviction as an accessory.  After the murder, Hamby removed Hop's backpack from Tex Lockley's red truck and discussed with Mike Sutton and Scarecrow Roanhouse ways to dispose of it.  Although she eventually turned the backpack over to the sheriff, she lied to him about how she had obtained it.  And she did not reveal to Sergeant Kartchner or the other investigating officers all that she knew about the murder.
>
> The Attorney General argues, however, that the third prong of Geiger has not been met, as defendant Hamby did not rely

24

upon a theory that she was guilty at most of being an accessory to the conspiracy.[FN] This point is valid.  Under the third prong of Geiger, "the instructions must be justified by the defendant's reliance on a theory of defense that would be consistent with a conviction for the related offense.  Thus, the instruction need not be given if the defense theory and evidence reflect a complete denial of culpability as when the defense is alibi, or the only issue is identity, unless the defendant argues that the evidence at most shows guilt only of the related offense."  (People v. Geiger, supra, 35 Cal.3d at pp. 531-532.)

> FN.  The Attorney General further argues that the second prong of the Geiger test has not been met, because the evidence of Hamby's conduct after the murder did not tend to prove or disprove any element of conspiracy.  The Attorney General reasons that by the time Hamby acted to conceal the killing the crime of conspiracy had ended.  The argument is not convincing.  Geiger requires only that the evidence relied upon for the lesser related offense also be "relevant to and admitted for the purpose of establishing whether the defendant is guilty of the charged offense."  (35 Cal.3d at p.531.)  The Attorney General has read too restrictively the language in People v. Hill (1993) 12 Cal.App.4th 798, 806.  In that case, the court explained that evidence supporting a lesser related offense must pertain to the elements of the charged offense and not simply the identity of the perpetrator, because when there is a question about identity there is no incentive to convict the defendant of some crime.

> In any event, even if the conspiracy had ended once the killing occurred, the evidence of Hamby's post-killing conduct permitted the inference that she had been part of the conspiracy all along. Indeed, the prosecutor in closing argument pointed to Hamby's falsehoods to the police as proof of Hamby's participation in the conspiracy.  Thus, contrary to the Attorney General's assertion, the evidence was relevant to an element of the charge of conspiracy, the element of Hamby's membership in the conspiracy.  And that same evidence would support a conviction of accessory after the fact.

25

Here, Hamby denied the conduct that would support a conviction for accessory. She denied taking Hop's backpack from Tex Lockley's truck; she claimed she found it in her trailer. She denied discussing how to dispose of the backpack. In closing argument, defense counsel did not mention the offense of accessory.

Defendants Frazier and Hamby further argue that even if an instruction on accessory was not required under <u>Geiger</u>, the trial court erred in withdrawing the instruction after having announced that it would be given.  Defendants rely upon <u>People v. Sanchez</u> (1978) 83 Cal.App.3d Supp. 1, 7, in which the court found prejudicial error in the trial court's belated decision to withdraw an instruction on a defense theory. We reject the argument.

Penal Code section 1093.5 requires the trial court to decide upon the instructions before the commencement of argument.[FN]  However, any error is harmless if there was no hindrance to counsel's ability to argue the case.  (<u>People v. Orchard</u> (1971) 17 Cal.App.3d 568, 577.)  The <u>Sanchez</u> case is readily distinguishable.  There, the trial court changed its mind in the presence of the jury in the midst of defense counsel's closing argument, requiring counsel to make abrupt changes in his argument and destroying defense counsel's credibility with the jury.  Here, in contrast, the jury did not know that the theory of accessory had been withdrawn.  Nor were defense counsel hindered in their ability to argue the case.

> FN. Penal Code section 1093.5 provides: "In any criminal case which is being tried before the court with a jury, all requests for instructions on points of law must be made to the court and all proposed instructions must be delivered to the court before commencement of argument. Before the commencement of the argument, the court, on request of counsel, must : (1) decide whether to give, refuse, or modify the proposed instructions; (2) decide which instructions shall be given in addition to those proposed, if any; and (3) advise counsel of all instructions to be given.  However, if, during the argument, issues are raised which have not been covered by instructions given or refused, the court may, on request of counsel, give additional instructions on the subject matter thereof."

Neither defendant relied upon the theory of being an accessory in closing arguments.  Counsel did not mention the offense, nor did either counsel focus on the evidentiary basis

1    for the crime of being an accessory.  We can see no
     prejudice from the trial court's belated decision to withdraw
2    the instruction.

3    Opinion at 24-27.

4            3)      Applicable Law And Discussion

5            To the extent that Hamby is arguing that the trial court violated her right to

6    an instruction on accessory after the fact, there is no constitutional right to an instruction

7    based on lesser related offenses that are not lesser included offenses under state law.

8    Hopkins v. Reeves, 524 U.S. 88, 96-98 (1998) ("Almost all States ... provide instructions

9    only on those offenses that have been deemed to constitute lesser included offenses of

10   the charged crime.  We have never suggested that the Constitution requires anything

11   more.") (citations omitted).  Hamby does not argue that being an accessory after the fact

12   to conspiracy is a lesser included offense of conspiracy and under California law being

13   an accessory after the fact to murder is not a lesser included offense of murder.  People

14   v. Majors, 18 Cal.4th 385, 408 (1998); People v. Preston, 9 Cal.3d 308, 319-320 (1973).

15          To the extent Hamby is arguing that the trial court's decision adversely

16   impacted her defense, the Supreme Court has held that a denial of an opportunity to

17   make a closing argument violates a criminal defendant's constitutional rights.  Herring v.

18   New York, 422 U.S. 853, 862 (1975) (holding that statute authorizing trial judge in non-

19   jury criminal case to refuse to hear defense closing argument violated the Sixth

20   Amendment); see also United States v. Mack, 362 F.3d 597, 602 (9th Cir. 2004) ("It can

21   hardly be doubted that a defendant has a right to a closing argument.").  Further, the

22   "[f]ailure to instruct on the defense theory of the case is reversible error if the theory is

23   legally sound and evidence in the case makes it applicable."  Beardslee v. Woodford,

24   358 F .3d 560, 577 (9th Cir. 2004) (as amended); see also Bradley v. Duncan, 315 F.3d

25   1091, 1098 (9th Cir. 2002) ("[T]he right to present a defense would be empty if it did not

26   entail the further right to an instruction that allowed the jury to consider the defense.")

27

1   (internal quotation marks omitted); <u>Conde v. Henry</u>, 198 F.3d 734, 739 (9th Cir. 2000)

2   (as amended) ("It is well established that a criminal defendant is entitled to adequate

3   instructions on the defense theory of the case.").  A habeas petitioner must show

4   however that the alleged trial error "had substantial and injurious effect or influence in

5   determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637 (citation omitted); <u>see also</u>

6   <u>Beardslee</u>, 358 F.3d at 578.

7           Here Hamby argues that, by initially agreeing to issue the instruction, and

8   then reversing that decision after closing arguments had already been completed, the

9   trial court prevented Hamby's counsel from "adequately representing" her.  Hamby

10  argues that the decision was "fundamentally unfair," and that it "improperly removed from

11  the jury's consideration an issue presented by the evidence."  Second Amended Petition

12  at 15.  However, as the trial court and the California Court of Appeal found, Hamby did

13  not rely on the theory of being an accessory in her closing arguments.[2]  <u>See</u> RT at 4874-

14  4923.

15          Hamby's defense counsel did not mention the offense of accessory during

16  her closing argument.  To the contrary, the complete thrust of her closing argument was

17  that Hamby was not involved in any of the crimes charged.  <u>Id.</u> at 4922.  That closing

18  argument was consistent with Hamby's trial testimony in which she denied involvement

19  in the conspiracy and the murder.  <u>Id.</u> at 4085-4392.  Deciding not to issue the instruction

20  after Hamby failed to present an accessory argument in no way prevented Hamby from

21  presenting her defense theory.  Further, not issuing the instruction did not negatively

22  impact the jury's verdict, because the jury heard no argument on the matter and was

23  totally unaware of the issue.

24

25          [2] Hamby's co-defendant, Frazier, also did not make an accessory argument
26  during her closing, which is what caused the trial judge to reconsider issuing the
    instruction.  RT at 4974.

1   Neither Hamby's closing argument nor the jury's verdict was impacted by

2   the trial court's decision to not issue the instruction.  Therefore, even if the trial court's

3   decision was error, which it was not, Hamby's claim would still fail because she cannot

4   show that the decision had a substantial and injurious effect on the jury's verdict.

5   The state court's rejection of this claim was neither contrary to, nor an

6   unreasonable application of, clearly established constitutional law and Hamby is not

7   entitled to relief on this claim.

8   C.   Cumulative Error

9   1)   Description of Claim

10   Hamby argues that the failure to give "any lesser included jury instructions

11   rendered her conviction for conspiracy to commit first degree murder fundamentally

12   unfair and a denial of federal due process."  Second Amended Petition at 17.

13   2)   Applicable Law And Discussion[3]

14   In cases where there are a number of trial errors, the court may look at "the

15   overall effect of all the errors in the context of the evidence introduced at trial against the

16   defendant."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting

17   United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988)).  "In other words, 'errors

18   that might not be so prejudicial as to amount to a deprivation of due process when

19   considered alone, may cumulatively produce a trial setting that is fundamentally unfair.' "

20   Alcala v. Woodford, 334 F.3d 862, 883 (9th Cir. 2003) (quoting Thomas v. Hubbard, 273

21   F.3d 1164, 1180 (9th Cir. 2001)).

22   However, "where there is no single constitutional error existing, nothing can

23   accumulate to the level of a constitutional violation."  Fuller v. Roe, 182 F.3d 699, 704

24   (9th Cir. 1999), overruled on other grounds by Slack v. McDaniel, 529 U.S. 473 (2000).

25

26   ───────────────────

[3] There is no opinion by the state court as to this claim.

1   Here, there was no single error committed and therefore there was no cumulative error.

2   Hamby thus is not entitled to relief on this claim.

3   VI.     <u>CONCLUSION</u>

4           Accordingly, IT IS RECOMMENDED that petitioner's petition for a writ of

5   habeas corpus be denied.

6           These findings and recommendations are submitted to the United States

7   District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

8   Within twenty-one days after being served with these findings and recommendations,

9   any party may file written objections with the court and serve a copy on all parties.  Such

10  a document should be captioned "Objections to Magistrate Judge's Findings and

11  Recommendations."  Any reply to the objections shall be served and filed within seven

12  days after service of the objections.  Failure to file objections within the specified time

13  may waive the right to appeal the District Court's order. <u>Turner v. Duncan</u>, 158 F.3d 449,

14  455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

15  elects to file petitioner may address whether a certificate of appealability should issue in

16  the event he elects to file an appeal from the judgment in this case. <u>See</u> Rule 11, Federal

17  Rules Governing Section 2254 Cases (the district court must issue or deny a certificate

18  of appealability when it enters a final order adverse to the applicant).

19  DATED: May 20, 2010

20                              *Charlene H. Sorrentino*
                                _____
21                              CHARLENE H. SORRENTINO
                                UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26